UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:22-cv-23269

CONNIE BYRD,

    Plaintiff,

v.

CARNIVAL CORPORATION & PLC,

    Defendant.

_____/

**COMPLAINT FOR DAMAGES
AND DEMAND FOR TRIAL BY JURY**

Plaintiff, CONNIE BYRD (hereinafter "BYRD"), through undersigned counsel, sues Defendant, CARNIVAL CORPORATION & PLC (hereinafter "CARNIVAL"), and demands trial by jury, stating as follows:

**PARTIES AND JURISDICTION**

1. BYRD seeks damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

2. This Court has admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

3. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states and/or citizens of a state and citizens or subjects of a foreign state.

4. Suit is filed in federal court because of the federal forum selection clause in the passenger contract ticket issued by CARNIVAL.

5. BYRD is *sui juris* and is a resident and citizen of the state of North Carolina.

6. CARNIVAL is a citizen of the state of Florida and the nations of Panama and the United Kingdom.

7. CARNIVAL is a foreign corporation that is authorized to conduct and that does conduct business in the state of Florida, that at all times material hereto was and is doing business in Miami-Dade County, Florida, and that maintains its corporate headquarters and principal place of business in Miami-Dade County, Florida.

8. CARNIVAL, at all times material hereto, personally and/or through an agent, in Miami-Dade County, Florida, in the Southern District of Florida:

    a. Operated, conducted, engaged in, or carried on a business venture; and/or

    b. Had an office or agency; and/or

    c. Engaged in substantial activity; and/or

    d. Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193.

9. All conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

## DEFINITIONS AND FACTUAL ALLEGATIONS

10. At all times material hereto, CARNIVAL owned, leased, chartered, operated, maintained, managed, and/or controlled the subject cruise ship, the *Sunshine*.

11. At all times material hereto, CARNIVAL owned, leased, chartered, operated, maintained, managed, and/or controlled the subject area involved in BYRD'S incident.

12. BYRD'S incident occurred on or about August 23, 2022, while she was on a cruise as a fare paying passenger of CARNIVAL'S vessel, the *Sunshine*.

13. On or about August 23, 2022, between approximately 6:00 and 7:00 p.m., BYRD was standing outside the duty-free gift shop on deck 5. Inside the store, a young male passenger ("assailant") was apparently trying to steal a liquor bottle while under the legal age to drink. He had a strong smell of alcohol, such that the crewmembers in the area should have noticed immediately that he was intoxicated and therefore a potential danger. BYRD politely told the assailant that he was not allowed to steal the liquor bottle and immediately asked the store's crewmembers to call for security. The assailant immediately became belligerent and started loudly screaming at her, such that the crewmembers in the area should have known of the danger of this passenger to BYRD. However, the crewmembers in the area simply stood and watched without taking any action for BYRD's safety and did not call security for approximately fifteen minutes as the situation escalated. The assailant then grabbed BYRD's hair and pushed her head into a metal sign, causing severe injuries to BYRD.

14. Over the next approximately thirty minutes, BYRD's incident then evolved into a full-fledged brawl. BYRD cried out for help, and her daughter ran to help get the assailant to let go of BYRD. The assailant screamed at BYRD's daughter and said that he would shoot her and her unborn child. the assailant's mother then approached BYRD and screamed at her. BYRD's sister-in-law then intervened to protect BYRD from the assailant's mother. Then the assailant's father threw a glass down the hall toward BYRD's brother-in-law, causing him to become cut and injured.

15. As a result, BYRD sustained severe injuries that include, but are not limited to, a concussion, head injuries, bruises to her head, arms, and face, and possible traumatic brain injur(ies), among other serious injuries.

16. BYRD had to wait for approximately forty-five (45) minutes for CARNIVAL'S staff to attend to her injuries. CARNIVAL'S staff finally took her to the ship's medical center, and the ship's doctor told her to apply ice to her head, but failed to diagnose her injuries, including her concussion, other severe head injuries, and possible traumatic brain injur(ies). Moreover, BYRD was not prescribed pain medicine that was sufficiently strong for her trip home, such that she was in great pain for a longer amount of time.

17. CARNIVAL either knew or should have known of the danger of the people who assaulted and battered BYRD, due to reasons that include, but are not limited to, the following:

   a. BYRD's assailant had a strong smell of alcohol, such that the crewmembers in the area should have noticed immediately that he was intoxicated, and pursuant to CARNIVAL'S policies and procedures, intoxicated passengers are known to be dangerous to themselves and others, and they should have been separated from BYRD.

   b. BYRD asked the crewmembers in the area to call for security immediately, but it took CARNIVAL'S security at least approximately fifteen minutes to respond.

   c. Moreover, the crewmembers in the area simply stood and watched without taking any action for BYRD's safety while she was being assaulted and battered, and they had at least approximately fifteen minutes to take any reasonable measure for BYRD'S safety, but they failed to do so.

   d. A woman who was with BYRD's assailant told BYRD after her incident that incidents such as what occurred with BYRD'S assault and battery always happened when he was on vacations with her.

   e. Moreover, upon information and belief, this assailant cruised with CARNIVAL on previous occasions, and similar incidents involving them occurred.

f. After BYRD's incident, CARNIVAL stationed a security officer outside of her cabin for her protection, indicating that CARNIVAL knew that her assailant posed an ongoing danger to her and other passengers.

g. BYRD observed CARNIVAL crewmembers in the subject area at the time of the incident, and these crewmembers were in the immediate vicinity, such that they were or should have been aware of the dangers of BYRD's assailant.

h. There are relevant safety standards/recommendations/other guidelines regarding handling dangerous, intoxicated, and otherwise unruly passengers such as BYRD's assailant, including, but not limited to, standards/recommendations/other guidelines requiring such passengers to be separated from each other and/or possible victims, as well as standards/recommendations/other guidelines requiring security presence to deter danger, among other standards/recommendations/other guidelines, and CARNIVAL should have known of these standards/recommendations/other guidelines because whether such standards/recommendations/other guidelines are legally required for CARNIVAL to comply with or not, a fact-finder is entitled to determine, if it so choses, that these standards/recommendations/other guidelines show what a reasonable cruise line should have done.

i. Previous passengers in prior cases suffered prior incidents involving similar assaults and/or batteries on ships in CARNIVAL's fleet (including Carnival Cruise Line, Princess Cruises, Holland America Line, Seabourn, P&O Cruises (Australia), Costa Cruises, AIDA Cruises, P&O Cruises (UK) and Cunard), including, but not limited to, *Gould v. Carnival Corp.*, No. 19-CV-20289, 2021 WL 4189588, at *3 (S.D. Fla. Sept. 15, 2021), *H.S. by & through R.S. v. Carnival Corp.*, 727 F. App'x 1003, 1004 (11th

Cir. 2018), and *Heald v. Carnival Corp.*, No. 18-22300-CIV, 2019 WL 1318190, at *1 (S.D. Fla. Jan. 16, 2019).

j. Moreover, CARNIVAL knew or should have known of these dangers for reasons that will be revealed through discovery.

18. The danger of shipboard brawls on CARNIVAL's ships was neither open nor obvious to BYRD.

19. The crewmembers of the *Sunshine* were in regular full-time employment of CARNIVAL and/or the ship, as salaried crewmembers.

20. CARNIVAL's crewmembers, employees, and/or agents were subject to the ship's discipline and master's orders, and CARNIVAL had the right to hire and fire its crewmembers, employees, and/or agents.

21. CARNIVAL is directly responsible and liable for their actions and the actions of its crewmembers, employees, and/or agents.

22. The crewmembers, including the medical staff, were employees and/or actual agents and/or apparent agents of CARNIVAL, and acted within the course and scope of their employment and/or agency agreement and/or relationship.

23. The crewmembers were represented to BYRD and the ship's passengers as employees of CARNIVAL through signs, documents, and/or uniforms. The crewmembers were also paid a salary and/or hourly wage by CARNIVAL. CARNIVAL knew that the crewmembers represented themselves to be employees of CARNIVAL and allowed them to represent themselves as such. BYRD detrimentally relied on these representations as BYRD would not have proceeded on the subject cruise had BYRD believed the crewmembers were not employees of CARNIVAL.

## COUNT I
## NEGLIGENT FAILURE TO WARN

24. BYRD hereby adopts and re-alleges each and every allegation in paragraphs 1 through 23, as if set forth herein.

25. At all times relevant, CARNIVAL owed a duty to exercise reasonable care under the circumstances for the safety of its passengers, including BYRD.

26. Such duty includes, but is not limited to, the duty that CARNIVAL owes to warn passengers of any dangers that it knew or should have known were not open and obvious to BYRD.

27. Such duty also includes, but is not limited to, the duty to warn passengers of hazards, which passengers may reasonably be expected to encounter.

28. At all times material, CARNIVAL, through its vessel, crew, agents, employees, staff and/or representatives, who were acting in the course and scope of their employment and/or agency with CARNIVAL, breached the duty of reasonable care owed to BYRD and was negligent by failing to warn BYRD of the danger of assaults, batteries, and fights occurring on its ships.

29. Furthermore, CARNIVAL knew or should have known of these dangers for the reasons discussed in paragraph 17 of this Complaint.

30. The danger of assaults, batteries, and fights occurring on CARNIVAL'S ships were neither open nor obvious to BYRD, and were not known to her prior to her incident.

31. Had BYRD known of the danger of assaults, batteries, and fights occurring on CARNIVAL'S ships, including the number of such fights, and the injuries previous passengers suffered as a result, BYRD would not have gone on the subject cruise.

32. CARNIVAL'S breach was the cause in-fact of BYRD'S great bodily harm in that, but for CARNIVAL'S breach, BYRD'S injuries would not have occurred.

33. CARNIVAL'S breach proximately caused BYRD great bodily harm in that the

incident that occurred was a foreseeable result of CARNIVAL'S breach.

34. As a result of CARNIVAL'S negligence, BYRD has suffered severe bodily injuries resulting in pain and suffering, disability, scarring, disfigurement, mental anguish, loss of independence, lost wages, lost earning capacity, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and loss of the value of BYRD'S vacation, cruise, and transportation costs.

35. The losses are permanent and/or continuing in nature.

36. BYRD has suffered these losses in the past and will continue to suffer such loses in the future.

**WHEREFORE**, Plaintiff, CONNIE BYRD, demands judgment against Defendant, CARNIVAL CORPORATION & PLC, for damages suffered and costs incurred, as well as for damages and costs that BYRD will suffer and incur in the future, as a result of BYRD'S bodily injury, pain and suffering, disability, disfigurement, scarring, mental anguish, hospitalization, medical care and treatment, nursing care and treatment, lost wages, lost earning capacity, loss of the value of BYRD'S vacation, cruise, transportation costs, loss of important bodily functions, loss of independence, and loss of capacity for the enjoyment of life, for all court costs, pre- and post-judgment interest, and for any and all other relief which this Court deems just or appropriate.

**COUNT II**
**NEGLIGENCE FOR THE ACTS OF CARNIVAL'S CREW, STAFF, EMPLOYEES, AND/OR AGENTS, BASED ON VICARIOUS LIABILITY**
**(FAILURE TO PROVIDE ADEQUATE SECURITY)**

37. BYRD hereby adopts and re-alleges each and every allegation in paragraphs 1 through 23, as if set forth herein.

38. CARNIVAL owed a duty to exercise reasonable care under the circumstances for the safety of its passengers.

39. The crewmembers who breached their duty of reasonable care by failing to assist BYRD during her incident and/or failing to provide adequate security, as well as the members of CARNIVAL'S security staff who breached their duty of care by failing to respond to the scene within a reasonable amount of time, were agents of CARNIVAL for the following reasons:

    a. They were the staff and/or employees of CARNIVAL, or were CARNIVAL'S agents, apparent agents, and/or servants; and/or

    b. These staff, employees, and/or agents were subject to the right of control by CARNIVAL; and/or

    c. These staff, employees, and/or agents were acting within the scope of their employment or agency; and/or

    d. CARNIVAL acknowledged that these staff, employees, and/or agents would act on CARNIVAL'S behalf, and they accepted the undertaking.

40. Furthermore, the subject area and the vicinity were also on a cruise ship in the water subject to numerous maritime conditions such as the ship's movement, additional wear-and-tear due to maritime conditions not necessarily present on land, waves, and other conditions unique to maritime travel, and as such were "clearly linked to nautical adventure."

41. CARNIVAL'S breach was the cause in-fact of BYRD'S great bodily harm in that, but for CARNIVAL'S breach, BYRD'S injuries would not have occurred.

42. CARNIVAL'S breach proximately caused BYRD great bodily harm in that the incident that occurred was a foreseeable result of CARNIVAL'S breach.

43. As a result of CARNIVAL'S negligence, BYRD has suffered severe bodily injuries resulting in pain and suffering, disability, scarring, disfigurement, mental anguish, loss of independence, lost wages, lost earning capacity, loss of capacity for the enjoyment of life, expense

of hospitalization, medical and nursing care and treatment, and loss of the value of BYRD'S vacation, cruise, and transportation costs.

44. The losses are permanent and/or continuing in nature.

45. BYRD has suffered these losses in the past and will continue to suffer such loses in the future.

**WHEREFORE**, Plaintiff, CONNIE BYRD, demands judgment against Defendant, CARNIVAL CORPORATION & PLC, for damages suffered and costs incurred, as well as for damages and costs that BYRD will suffer and incur in the future, as a result of BYRD'S bodily injury, pain and suffering, disability, disfigurement, scarring, mental anguish, hospitalization, medical care and treatment, nursing care and treatment, lost wages, lost earning capacity, loss of the value of BYRD'S vacation, cruise, transportation costs, loss of important bodily functions, loss of independence, and loss of capacity for the enjoyment of life, for all court costs, pre- and post-judgment interest, and for any and all other relief which this Court deems just or appropriate.

## COUNT III
## NEGLIGENCE AGAINST CARNIVAL FOR THE ACTS OF ITS CREWMEMBERS BASED ON VICARIOUS LIABILITY
## (OVERSERVICE OF ALCOHOL)

46. BYRD hereby adopts and re-alleges each and every allegation in paragraphs 1 through 23, as if set forth herein.

47. CARNIVAL owed a duty to exercise reasonable care under the circumstances for the safety of its passengers.

48. This duty includes, but is not limited to, the responsibility of a marine carrier of passengers under applicable U.S. maritime common law to supervise and/or assist passengers aboard the vessel who CARNIVAL knew, or should have known, are engaging, or are likely to engage, in behavior potentially dangerous to themselves or others aboard the vessel.

49. A primary reason why U.S. maritime common law places these duties upon marine carriers of passengers, rather than leaving it up to the passengers to supervise themselves in what (at least to the passengers) are the unfamiliar surroundings of a cruise ship, is to prevent marine accidents and causalities from occurring aboard vessels navigating on the high seas. Such incidents, unlike shoreside accidents, have the potential and likelihood to disrupt international commerce by diverting vessels from their itineraries for the purpose of obtaining advanced medical treatment and/or to conduct rescue operations and/or to call other vessels and/or shoreside agencies like the U.S. Coast Guard to come to render assistance.

50. CARNIVAL deliberately makes alcohol available to passengers and crew aboard its vessels, despite knowing that alcohol is banned for safety reasons aboard vessels operated by the U.S. Government and military and aboard U.S. flagged merchant ships.

51. The sale of alcohol, in fact, represents one of the top sources of on-board revenue to CARNIVAL, grossing over millions per year, upon information and belief.

52. To maximize this revenue, CARNIVAL deliberately designs its vessels such as the Sunshine to ensure that there are alcohol serving stations in every nook and cranny of the ship.

53. Neither CARNIVAL nor the law of the relevant flag nation(s) impose a "legal limit" or any other legal consequences for alcohol consumption or intoxication aboard CARNIVAL'S ships. Neither does CARNIVAL employ any systematic method to keep track of how much alcohol a particular passenger has consumed over time, other than perhaps looking for visual signs of intoxication, which of course means that the individual is already drunk.

54. CARNIVAL, quite to the contrary, deliberately does as much as possible to encourage and facilitate alcohol consumption aboard its vessels.

55. CARNIVAL fully understands and expects that alcohol consumption by passengers

will result in the diminution of their inhibitions and good judgment, which CARNIVAL, upon information and belief, expects will foster the general party atmosphere that CARNIVAL desires, and promotes aboard its vessels, so as to enhance some of its other revenue producing shipboard activities such as gambling and the purchase of more alcohol.

56. CARNIVAL thus knew that the presence of intoxicated passengers aboard its vessels, including in the subject area and the vicinity, was common.

57. As a result of CARNIVAL'S scienter as described above, and as described in paragraph 17 of this complaint, CARNIVAL had notice of the risk of the subject incident, which was foreseeable.

58. CARNIVAL'S above-described knowledge and information was not possessed by BYRD, at all relevant times.

59. BYRD'S assailant drank numerous alcoholic beverages in the hours leading up to her incident.

60. It is foreseeable to CARNIVAL that allowing drunk passengers to roam about the ship increases the probability of the dangers and risks associated with drunken behavior including uninvited physical contact perpetrated by intoxicated passengers on other unsuspecting passengers.

61. As a result of consuming an unreasonable amount of alcoholic beverages, BYRD'S assailant became intoxicated within hours prior to her incident, and BYRD'S assailant's state of intoxication was and/or should have been readily observable to any reasonable person, including CARNIVAL's crewmembers.

62. Alternatively, if BYRD'S assailant did not become intoxicated, BYRD'S assailant became impaired and/or his ability to perceive his surroundings were otherwise adversely affected,

and this impaired/diminished condition was and/or should have been readily observable to any reasonable person, including CARNIVAL's crewmembers.

63. BYRD'S assailant were continuously served alcohol by CARNIVAL's crewmembers numerous times, well past the point where a person would become visually intoxicated.

64. CARNIVAL is vicariously liable for the acts of its crewmembers who continued to serve BYRD'S assailant alcoholic beverages past the point where they became visually intoxicated.

65. CARNIVAL knew, or should have known, that the risk and actual occurrences of violent incidents were magnified and/or influenced by factors such as the design and installation of the subject area and the vicinity, the unfamiliarity of passengers with its cruise ships, the passenger's lack of knowledge of the prior, severe incidents and/or injuries which CARNIVAL knew to be associated with the consumption of alcoholic beverages, the presence and consumption of alcohol aboard vessels which reduced passengers' judgment, and the general party atmosphere fostered aboard the vessel by CARNIVAL, which deliberately markets all you can drink beverage packages.

66. The crewmembers who breached their duty of reasonable care by over-serving alcohol to BYRD'S assailant were agents of CARNIVAL for the following reasons:

    a. They were the staff and/or employees of CARNIVAL, or were CARNIVAL'S agents, apparent agents, and/or servants; and/or

    b. These staff, employees, and/or agents were subject to the right of control by CARNIVAL; and/or

    c. These staff, employees, and/or agents were acting within the scope of their employment or agency; and/or

  d. CARNIVAL acknowledged that these staff, employees, and/or agents would act on CARNIVAL'S behalf, and they accepted the undertaking.

67. Furthermore, the subject area and the vicinity were also on a cruise ship in the water subject to numerous maritime conditions such as the ship's movement, additional wear-and-tear due to maritime conditions not necessarily present on land, waves, and other conditions unique to maritime travel, and as such were "clearly linked to nautical adventure."

68. CARNIVAL'S breach was the cause in-fact of BYRD'S great bodily harm in that, but for CARNIVAL'S breach, BYRD'S injuries would not have occurred.

69. CARNIVAL'S breach proximately caused BYRD great bodily harm in that the incident that occurred was a foreseeable result of CARNIVAL'S breach.

70. As a result of CARNIVAL'S negligence, BYRD has suffered severe bodily injuries resulting in pain and suffering, disability, scarring, disfigurement, mental anguish, loss of independence, lost wages, lost earning capacity, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and loss of the value of BYRD'S vacation, cruise, and transportation costs.

71. The losses are permanent and/or continuing in nature.

72. BYRD has suffered these losses in the past and will continue to suffer such loses in the future.

**WHEREFORE**, Plaintiff, CONNIE BYRD, demands judgment against Defendant, CARNIVAL CORPORATION & PLC, for damages suffered and costs incurred, as well as for damages and costs that BYRD will suffer and incur in the future, as a result of BYRD'S bodily injury, pain and suffering, disability, disfigurement, scarring, mental anguish, hospitalization, medical care and treatment, nursing care and treatment, lost wages, lost earning capacity, loss of

the value of BYRD'S vacation, cruise, transportation costs, loss of important bodily functions, loss of independence, and loss of capacity for the enjoyment of life, for all court costs, pre- and post-judgment interest, and for any and all other relief which this Court deems just or appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, CONNIE BYRD, demands trial by jury on all issues so triable.

**Dated:** October 7, 2022.

        Respectfully submitted,

*/s/ Matthias M. Hayashi*
**Spencer M. Aronfeld, Esq.**
Florida Bar No.: 905161
aronfeld@Aronfeld.com
**Matthias M. Hayashi**
Florida Bar No.: 115973
mhayashi@aronfeld.com
**Abby H. Ivey, Esq.**
Florida Bar No.: 1002774
aivey@aronfeld.com
**ARONFELD TRIAL LAWYERS**
One Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
P:    (305) 441.0440
F:    (305) 441.0198
***Attorneys for BYRD***